UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARY TOLLIVER, et al.,

   Plaintiffs,

  v.

ILLINOIS TOOL WORKS INC.,

   Defendant.

Case No. 18-cv-01078-KAW

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO STRIKE; GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 58, 59

Plaintiffs filed the instant case[1] against Defendant Illinois Tool Works Inc., asserting product liability and negligence claims with respect to the death of Johnny Tolliver, Sr. (*See* First Amended Compl. ("FAC") ¶ 1, Dkt. No. 30.) Pending before the Court are Defendant's motion for summary judgment and motion to strike Plaintiffs' expert opinions. (Def.'s MSJx, Dkt. No. 58; Def.'s Mot. to Strike, Dkt. No. 59.)

Having considered the parties' filings, the relevant legal authority, and the arguments made at the November 21, 2019 hearing, the Court GRANTS IN PART and DENIES IN PART Defendant's motion to strike, and GRANTS IN PART AND DENIES IN PART Defendant's motion for summary judgment.

### I. BACKGROUND

#### A. The Fatal Accident

Decedent was a Solid Waste Truck Driver, employed by the City of Berkeley's Public

---

[1] Plaintiffs originally filed two separate cases in Alameda County Superior Court. (*See* Dkt. No. 24.) After both cases were removed to federal court, the parties stipulated to the consolidation of the matters. (*Id.*)

Works Zero Waste Division since January 20, 1991. (Westfall Decl. ISO Def.'s MSJx, Exh. 2 ("Berkeley Accident Report") at 6, Dkt. No. 58-1.) Decedent held a Class B commercial vehicle driver's license with restriction limited to vehicles with automatic transmission. (*Id.*)

On January 11, 2016, Decedent was assigned Vehicle #350, a 1994 Crane Carrier Company rear-loading vehicle ("Subject Truck"). (Berkeley Accident Report at 9; FAC ¶ 11.) Decedent and his helper, Andres Herrera, were assigned Garbage Route Area B ("GRB"), a bid route that Decedent had held for at least three years. (Westfall Decl. ISO Def.'s MSJx, Exh. 1 ("Carr Dep.") at 85:3-86:13; *see also* FAC ¶ 10.)

Decedent parked the Subject Vehicle on Parnassus Road in Berkeley, California. (Berkeley Accident Report at 5; FAC ¶ 13.) Parnassus Road is a residential street with an approximate 5% north/west decline. (Berkeley Accident Report at 5.) The Subject Vehicle was parked for at least one minute when Mr. Herrera heard an unusual hissing sound. (Berkeley Accident Report at 7; Westfall Decl. ISO Def.'s MSJx, Exh. 5 ("CHP Report") at 22; Westfall Decl. ISO Def.'s MSJx, Exh. 6 ("BPD Report") at 7.) The Subject Vehicle then began moving forward and downhill. (Berkeley Accident Report at 5.) The Subject Vehicle proceeded down the street for approximately 75 feet, contacting small trees and bushes. (*Id.* at 2, 5.) The Subject Vehicle ultimately entered into the upper front yard of 90 Parnassus Road, going over a retaining wall approximately three feet high into the lower yard before it stopped. (*Id.* at 5.)

While the Subject Vehicle was rolling downward, Decedent and Mr. Herrera attempted to stop the Subject Vehicle. (Berkeley Accident Report at 5, 7.) Decedent was on the driver's side when he suffered fatal blunt force injuries, possibly when the truck crushed him against a utility pole or tree. (*Id.* at 2; BPD Report at 8, 13.) Responding Berkeley Police Department ("BPD") photos showed the transmission gear shift was in third gear. (Berkeley Accident Report at 10.) The neutral interlock switch was activated in the "on" position, and the air pressure gauge indicated between 55 and 60 psi. (*Id.* at 9; *see also* Westfall Decl. ISO Def.'s Mot. to Strike, Exh. 8 ("Granda Report") at 47.)[2]

---

[2] The parking brake was engaged, although Defendant contends the parking brake was engaged when a neighbor turned off the Subject Vehicle's ignition, automatically triggering the parking

2

Following the accident, the California Highway Patrol ("CHP") performed a mechanical inspection of the Subject Vehicle. (CHP Report at 22.) The inspection "did not reveal any evidence of pre-existing mechanical conditions or failures of the air powered brake system, transmission shifter or other mechanical systems that would have affected its safe operation upon the highway." (*Id.*) The CHP detected a "minor air leak . . at the adjustable air pressure regulator inside of the cab," but determined the leak was "not . . . a contributing factor of this collision" because "[w]hen checked, the air compressor maintained adequate air pressure in the reservoirs while engaged." (*Id.*) The CHP ultimately could not determine what caused the Subject Vehicle to roll downhill. (*Id.*) The CHP found, however, that the transmission shifter was in the third gear, and that "[t]his condition would mandate that a driver be present in one of the driver positions to apply the service or parking/emergency brakes. Without a driver present inside of [the Subject Vehicle, the Subject Vehicle] would be powered under engine torque causing it to propel forward, especially with the descending hill [the Subject Vehicle] was on." (*Id.*) Similarly, the City of Berkeley examined the mechanical systems and "found that the neutral interlock system and all other brake system components were functioning properly prior to the accident." (Berkeley Accident Report at 10.)

### B. The Neutral Interlock Control System

The Subject Vehicle is equipped with two distinct braking systems: the service or "air brake" system and a mechanical parking brake system. (Westfall Decl. ISO Def.'s MSJx, Exh. 8 ("Carpenter Dep.") at 53:24-56:3.) The air brakes use air pressure to apply the brakes, and is engaged by stepping on the foot pedal. (Carpenter Dep. at 54:3-11, 55:18-23; Westfall Decl. ISO Def.'s MSJx, Exh. 9 ("Ivie Dep.") at 158:6-9.) The parking brake is engaged by pulling up a yellow knob on the dashboard. (Ivie Dep. at 158:10-15.)

The Subject Vehicle also has a Neutral Interlock Control System ("NICS"), "a safety system that automates multiple functions of the truck to make it more user friendly . . . ."

---

brake. (*See* Def.'s MSJx at 3; Berkeley Accident Report at 7, 9.) Defendant's citations do not attribute the parking brake being engaged to the neighbor turning off the ignition. In any case, the Berkeley investigation ultimately found – and Plaintiffs do not dispute – that the parking brake was not engaged when the Subject Vehicle began to roll. (Berkeley Accident Report at 11.)

(Carpenter Dep. at 44:22-4.) The NICS is armed or activated when the NICS "rocker switch" is put on the "on" position. (Carpenter Decl. at 65:7-12.) The NICS is engaged by placing the truck's transmission gearshift level into the neutral position; it cannot be engaged if the truck's transmission is in third gear. (Carpenter Decl. at 66:25-67:21, 68:17-23.)

When activated and engaged, the NICS applies the service brake to all of the wheels. (Carpenter Dep. at 65:13-17.) The NICS must be used to collect garbage. (Carpenter Dep. at 65:18-21 ("Q: Does someone who operates the subject truck have to use the neutral interlock to collect garbage? A: As the truck is currently set up, yes."); *see also id.* at 66:8-24.) The NICS can be engaged at the same time as the parking brake. (Carpenter Dep. at 64:5-9.) If the NICS itself loses pressure at 60 psi, it will apply the parking brakes. (Carpenter Dep. at 58:2-4, 58:22-59:14.)

### C. Expert Opinions

In support of their claims for product liability and negligence, Plaintiffs present reports from three experts: Jose J. Granda, Paul Herbert, and Kenneth Nemire. Dr. Granda, a professor of mechanical engineering, opines that as Decedent and Mr. Herrera collected garbage from nearby homes, the Subject Vehicle's NICS was activated and engaged, which would have applied the service brake. (Granda Report at 8.) The Subject Vehicle then experienced a loss of pressure, as evidenced by the unusual hissing sound that Mr. Herrera reported. (*Id.* at 6.) The pressure on the service brake (or air brakes) went from 100-120 psi to 55 psi; "this sudden loss of pressure on the service brake side while under the control of the [NICS] diminished the friction forces that the brake shoes produced to the point the friction forces were less than the downhill weight component and the truck started rolling slowly downhill." (*Id.*) The parking brakes, which should have been triggered by the loss of pressure below 60 psi, did not activate. (*Id.* at 7.) Dr. Granda further opines that despite the loss of pressure, the brakes still kept 55 psi, resulting in "some braking forces acting all the way down. These, combined with opposing forces when the truck hit a telephone pole, uprooted a tree, dragged it underneath and cracked a retaining barrier contributed to dissipate the" energy the truck had from its descent, which is why the truck did not roll through the house. (*Id.*) Dr. Granda opines that on inspection, the truck had a defective air brake system. (*Id.* at 10.)

4

Dr. Granda further opines that the NICS failed to consider fault conditions besides the low pressure and electrical failure in determining when to trigger the parking brakes, such as incline, velocity, or acceleration. (Granda Report at 8.) If the parking brakes had activated, the death would not have occurred. (*Id.* at 9.) Thus, once the NICS was activated and engaged, there should have been other backup systems that triggered the parking breaks. (*Id.* at 11.)

Mr. Herbert, an expert in commercial motor vehicle safety standards, opined that the NICS "is not designed to be used as a parking brake," and that "[d]ue to the complexity of the setup, the propensity for malfunctions due to failed components, and broken or otherwise compromised air lines and connections, is tremendous[.]" (Westfall Decl. ISO Mot. to Strike, Exh. 5 ("Herbert Report") at 7-8.) Mr. Herbert opines that the air compressor was creating pressure intermittently, indicating a probable malfunction of the air pressure governor or other air system component designed for maintaining an adequate supply of pressurized air for the braking system. (*Id.* at 8-9.) Due to a likely leak, the truck began to roll because the air system failed to maintain sufficient pressure, allowing the brakes to partially release. (*Id.* at 9.)

Mr. Herbert further opines that the only effective and safe way to prevent unintended movement of the Subject Vehicle is to apply the parking brakes prior to exiting the vehicle. (Herbert Report at 9.) He thus believes that "there must be very clear and concise warnings prominently displayed in a very conspicuous location within the cab," which "should very clearly state that [the NICS] system must never be used to immobilize the truck if the driver is going to exit the vehicle." (*Id.* at 8.) Further, the warning should state that drivers should never exit the vehicle without applying the parking brakes. (*Id.* at 9-10.)

Finally, Dr. Nemire, an experimental psychologist and human factors engineer, opines that Decedent failed to apply the parking brakes before exiting the Subject Vehicle. (Westfall Decl. ISO Mot. to Strike, Exh. 4 ("Nemire Report") at 5.) He further finds that the NICS system had a confusing design, in that it was unclear whether the NICS applied the service brake or the parking brake. (*Id.*) Dr. Nemire opines that Defendant could have obviated the confusion by having the NICS automatically set the parking brake or wheel chocks when engaged, or to warn users of the need to set the parking brakes or wheel chocks when exiting the vehicle. (*Id.* at 6-8.)

### D. Procedural History

On October 2, 2019, Defendant filed the instant motions for summary judgment and to strike Plaintiffs' expert opinions. On October 16, 2019, Plaintiffs filed their oppositions to the motions. (Pls.' Opp'n to Mot. to Strike, Dkt. No. 60; Pls.' Opp'n to MSJx, Dkt. No. 62.) On October 24, 2019, Defendant filed their replies. (Def.'s Reply re MSJx, Dkt. No. 64; Def.'s Reply re Mot. to Strike, Dkt. No. 65.)

## II. LEGAL STANDARD

### A. Motion to Strike

In determining whether expert testimony is admissible under Federal Rule of Evidence 702, the district court is charged with performing "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). This inquiry is "a flexible one," and "[i]ts overarching subject is the scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95.

### B. Motion for Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the

moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery, "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Id.* (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

## III. DISCUSSION

### A. Motion to Strike

#### i. Timeliness

Defendant seeks to exclude expert opinions that were not timely disclosed. Federal Rule

7

of Civil Procedure 26(a)(2) governs the disclosure of expert testimony, while Rule 26(e) governs the supplementation of expert disclosures. Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Thus, "Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Hoffman v. Constr. Protective Servs.*, 541 F.3d 1175, 1179 (9th Cir. 2008) (internal quotations omitted).

First, Defendants seek the exclusion of Dr. Granda's September 10, 2019 report, entitled: "Rebuttals to Defense Expert Reports in the Civil Case: Tolliver v. Crane Carrier." (*See* Westfall Decl. ISO Mot. to Strike, Exh. 1 ("Granda Rebuttal Report"), Dkt. No. 59-1.) This report was provided to Defendant on September 10, 2019, after the August 23, 2019 deadline for disclosure of rebuttal expert reports. (*See* Westfall Decl. ISO Mot. to Strike, Exh. 2; Dkt. No. 53.)

To the extent Dr. Granda's September 10, 2019 report is a rebuttal to Defendant's expert reports, exclusion is warranted per Rule 37(c)(1). Plaintiffs' suggestion that Dr. Granda's report is merely a "supplement" rather than a rebuttal is unpersuasive; the report is literally titled "Rebuttals to Defense Expert Reports," and has specific sections titled: "I. Rebuttal to Mr. Thomas Braun Report," "III. Rebuttal Comments to Mr. Focha's Report," "Rebuttal to Expert Solomon," and "Rebuttal to Expert Robertson." (Granda Rebuttal Report at 1, 13, 21, 22.) Plaintiffs themselves refer to the report as the "Granda Rebuttal" in their opposition to the motion for summary judgment. (*See* Plfs.' Opp'n to MSJx at 3.) The majority of the report is focused on contradicting the conclusions of Defendant's experts, quoting or summarizing portions of their findings and explaining why it is incorrect. (*See* Granda Rebuttal Report at 1-7, 13-22.)

In the alternative, Plaintiffs contend that the late disclosure was justified and harmless because they reasonably believed the Court would agree that the disclosures were supplemental rather than a rebuttal. (Plfs.' Opp'n to Mot. to Strike at 8.) As explained above, the Court disagrees because portions of Dr. Granda's September 10, 2019 report were clearly a direct rebuttal to Defendant's experts' opinions. Plaintiffs also suggest that there is no prejudice because

8

Defendant was able to depose Mr. Granda on September 11, 2019 – one day after the report was provided – and the Court could reopen discovery to allow for further deposition. (*Id.* at 9-10.) The Court again disagrees; providing the report at such a late stage gave Defendant little time to prepare for the deposition, and requiring that Defendant incur the costs of deposing Dr. Granda again is not harmless. Accordingly, the Court finds that exclusion is warranted, with the exception of Section II (pages 7-12) of the September 10, 2019 report. This Section, "Rebuttal to Mr. Braun's Comments on My Report," are a proper supplementation, as they explain why the criticisms of Dr. Granda's original report by Defendant's expert are incorrect and further explain the basis for Dr. Granda's prior conclusions.

Second, Defendant seeks the exclusion of certain deposition testimony by Dr. Kenneth Nemire and Mr. Paul Herbert because "Dr. Nemire offered new opinions about biomechanics and accident reconstruction" while "Mr. Herbert offered new opinions and theories, including those about the 'deceptive' nature of the [NICS], the functionality of the truck's hydraulics when the parking brake is set, purported 'under-pressurizing' of the pressure regulator in the [NICS], and critiques of defense expert opinions." (Def.'s Mot. to Strike at 4.) Defendant does not identify where these opinions are in the testimony, such that the Court has no practical way of determining whether these opinions are "new." It is not the Court's responsibility to comb through seventy pages of deposition testimony and compare it with two expert reports. The Court, therefore, denies Defendant's motion to exclude the unspecified deposition testimony of Dr. Nemire and Dr. Herbert.

### ii. Reliability

#### a. Dr. Granda

Defendant argues generally that Dr. Granda's opinions should be stricken because he is not qualified to perform accident reconstruction or opine about the Subject Vehicle. (Def.'s Mot. to Strike at 6-9.) First, Defendant contends that Dr. Granda has no expertise in the operation and design of commercial vehicle braking systems manufactured in 1994, and has not worked on accident reconstruction cases involving commercial vehicles. (*Id.* at 6.) The Court finds Defendant's argument relies on too narrow an understanding of the scientific methodologies

9

applicable in this case. Dr. Granda's report, specifically the accident reconstruction, does not appear to rely or require knowledge of how commercial vehicles work, but "on the basic engineering principles such as the laws of Physics used and accepted in the industry known as Statics and Dynamics, Vehicle Dynamics and Design and equations that control the motion of vehicles." (Granda Report at 5.) Dr. Granda further explains that the computer simulations used to recreate the accident "are controlled by the laws of physics and the mathematics behind them." (*Id.* at 6.) Thus, the accident reconstruction is primarily based on physics, mathematics, and engineering principles, which Defendant does not suggest Dr. Granda is deficient. Moreover, to the extent Defendant suggests Dr. Granda has insufficient expertise in the braking systems, the Court notes that Dr. Granda lays out the Subject Vehicle's brake system in pages 22-29 of his report. Defendant does not suggest that his understanding is incorrect, and it is not apparent to the Court that specialized knowledge in brake systems specifically manufactured in 1994 is necessary for Dr. Granda to apply basic principles of physics, engineering, and mathematics to this case.

Second, Defendant argues that several of Dr. Granda's "alternative feasible designs" require pre-existing systems that Dr. Granda asserts are part of the Subject Vehicle, but are in fact not. (Def.'s Mot. to Strike at 7.) For example, Dr. Granda states that the Subject Vehicle is equipped with an anti-lock brake system, an electronic control unit, and a back-up sensor, but Defendant states that it is not. (*Id.*) As discussed below, this specific testimony is problematic, but does not suggest that Dr. Granda's entire report must be stricken. Defendant does not explain how these findings would affect the remainder of Dr. Granda's opinions.

Third, Defendant contends that Dr. Granda's opinions "hinge on a key misunderstanding of how the truck works." (Def.'s Mot. to Strike at 7.) Defendant points to Dr. Granda's conclusion that the NICS was activated and engaged, and that a "catastrophic air loss" from 110 psi to 55 psi caused the truck to have "partial braking" as it rolled down the hill. (*Id.*)[3] Defendant argues, however, that Dr. Granda does not explain how the air pressure loss then affects the

---

[3] The Court notes Defendant's erroneous citation. Defendant cites to page 9 of the Granda Report, which does not appear to have any information about "catastrophic air loss" or a change of psi from 110 to 55.

pressure being supplied to the service brakes through the pressure regulator. (*Id.*) Defendant suggests this is significant because the pressure regulator would have applied a specified, preset pressure of 45 psi to the brakes. (*Id.* at 7-8.) It is not clear from Defendant's explanation what this would have changed, how it should have affected Dr. Granda's conclusions, or why it shows Dr. Granda is fundamentally unqualified. Rather, this appears to be an issue for the experts to present and for a jury to decide.

Accordingly, the Court denies Defendant's request to strike Dr. Granda's opinion as a whole.

                b. Opinions about Events Preceding the Subject Vehicle Rolling

Defendant next challenges the expert opinions as "unhelpful" because they rely on inadmissible hearsay testimony from Mr. Herrera. (Def.'s Mot. to Strike at 10-12.) Despite the efforts of both counsel, Mr. Herrera has not been deposed or successfully subpoenaed in this case. (*Id.* at 1 n.1.) Defendant argues that the experts rely on the inconsistent statements of Mr. Herrera in forming their opinions, such as how long the truck was stopped, whether the work brake was in use, and where Decedent was located when the truck began to roll. (*Id.* at 11-12.) Defendant generally fails to identify which of Plaintiffs' experts' opinions relied on these alleged inconsistencies, or explain how the inconsistencies would change their conclusions. With respect to whether the NICS was engaged, this is a question of fact that, as discussed below, has other evidence in support even excluding Mr. Herrera's statements.[4] Defendant also fails to cite any authority that suggests an expert opinion must be excluded if it contains any inadmissible hearsay testimony.[5] Thus, the Court cannot find that the opinions must be completely stricken.

---

[4] The Court observes that despite Mr. Herrera's inconsistent statements to the investigators, including the City of Berkeley, BPD, and CHP, Defendant still relies on the findings of *those* entities, which likewise would have to rely in part on Mr. Herrera's statements. (*See* Def.'s MSJx at 11-13.)

[5] Defendant cites to *Claar v. Burlington N. R.R.*, 29 F.3d 499 (9th Cir. 1994), but fails to provide a pincite. This is a common problem throughout Defendant's briefing. (*See also* Def.'s Mot. to Strike at 8-9, 19-21.) It is not the Court's role to read entire cases to determine what specific page Defendant is relying on. In reviewing *Claar*, the Court finds that the case does not specifically address expert opinions that cite to hearsay testimony. Instead, the experts failed to explain their reasoning and methods, did not rule out possible causes for injuries despite admitting "that this step would be standard procedure before arriving at a diagnosis," failed to discuss the majority of

c. Specific Opinions of Dr. Granda

Next, Defendant challenges specific opinions of Dr. Granda. First, Defendant argues that Dr. Granda found, without explanation, that certain tire marks near 90 Parnassus Road were "proof" that the NICS engaged. (Def.'s Mot. to Strike at 12.) As explained by Plaintiffs, however, skid marks cannot be created without the application of brakes; thus, at the very least, the skid marks show where the Subject Vehicle braked. Based on other information, such as the NICS needing to be activated to perform garbage collection activities, Dr. Granda could find that the NICS was engaged. The Court will not exclude this conclusion, although Defendant is free to cross-examine Dr. Granda on this issue, including whether the skid marks could have been activated by stepping on the foot pedal.

Second, Defendant challenges Dr. Granda's conclusions regarding Decedent's and Mr. Herrera's garbage collecting activities when the Subject Vehicle began to roll. (Def.'s Mot. to Strike at 14.) Dr. Granda found that both workers were dumping garbage on the back of the Subject Vehicle, relying on the location of the garbage cans and garbage. (Granda Report at 35-37.) Defendant argues that Dr. Granda's conclusion is false because there was only one garbage can on the Subject Vehicle's loading compartment in the pictures. (Def.'s Mot. to Strike at 14-15.) Dr. Granda, however, explained that there was both one undumped garbage can on the right side of the loading compartment and garbage on the left hand side, suggesting one can was already emptied. (Granda Report at 34-37.)

Third, Defendant argues Dr. Granda relied on cherry-picked and invented facts in forming his accident reconstruction simulation. (Def.'s Mot. to Strike at 15-18.) For example, Defendant suggests that the simulations failed to account for numerous forces that could have slowed the Subject Vehicle down, such as shrubs and trees and the utility pole. (*Id.* at 17.) Dr. Granda, however, specifically *denied* that he did not take into account the tree stump and other trees, explaining that he "g[a]ve the tree the benefit of the doubt that . . . it may affect the speed of the truck instead of just running it over . . . ." (Westfall Decl., Exh. 3 ("Granda Dep.") at 235:13-

---

the medical conditions alleged by the plaintiffs, and formed their opinions before reading the relevant literature. *Id.* at 501-02.

237:15.) Thus, he put in values that would slow the Subject Vehicle down, but not stop it completely. Indeed, he even explains that he "g[a]ve the tree the *maximum power possible* to stop the truck without stopping the truck . . . right there . . . ." (*Id.* at 238:15-25.) Likewise, Defendant also argues Dr. Granda did not take account of the cross-slope, but Dr. Granda explained why it was not necessary. (*See* Def.'s Mot. to Strike at 17; Granda Dep. at 233:24-234:24.) To the extent Defendant disagrees, this is a matter of expert opinion, not a sign of unreliability. Defendant also argues that Dr. Granda's simulation failed to adequately address the force acting against the Subject Vehicle when it dropped off the three-foot high retaining wall, suggesting that "[a]lthough Dr. Granda insisted that his simulation took into account the retaining wall where the truck came to rest, even a cursory review of his simulation demonstrates that he failed to adequately do so." (Def.'s Mot. to Strike at 17.) This conclusory statement that a "cursory review of his simulation" would contradict Dr. Granda's statement is not grounds for excluding the opinion.

d. Alternative Designs

Defendant also generally challenges Dr. Granda's and Dr. Nemire's opinions about alternative designs. (Def.'s Mot. to Strike at 18-20.) With respect to Dr. Granda, Defendant contends that Dr. Granda suggested alternative designs that relied on the Subject Vehicle being equipped with certain preexisting systems, specifically the anti-lock brake system, the electronic control unit, and the back-up sensor. The Subject Vehicle, however, did not have those devices, and thus it is not clear such alternative designs would be feasible. For the first time at the hearing, Plaintiffs seemed to argue that there is a question of fact regarding whether the Subject Vehicle has those systems. Plaintiffs' opposition, however, provides no evidence or argument suggesting that such a factual dispute exists. Therefore, the Court agrees such opinions must be excluded, as alternative designs that are specifically reliant on such systems existing would not be based on the facts of this case. Other alternative designs, however, such as inclusion of an incline detection sensor, forward motion sensor, and velocity sensor, do not appear dependent on these systems, and thus are admissible.

Defendant also suggests that testing is required for any opinions about alternative designs to be admissible, relying on *Winters v. Fru-Con Inc.*, 498 F.3d 734 (7th Cir. 2007). (Def.'s Mot.

13

to Strike at 19.)  The Seventh Circuit, however, specifically stated:

> [W]e have **not** mandated alternative design testing as an absolute prerequisite to the admission of expert testimony because the *Daubert* inquiry is a flexible inquiry.  There could be situations where the district court determines the proposed expert's testimony regarding an alternative design is reliable despite a lack of testing of the alternative design because the expert has adhered to the standards of intellectual rigor that are demanded in his or her professional work, such as relying on the data generated by other researchers, making proper personal observations or taking other appropriate actions.

*Id.* at 742-43 (internal quotation omitted).

Here, the Court finds that the failure to test does not require that Dr. Nemire's and Dr. Granda's opinions on alternative designs be stricken.  Dr. Nemire, for example, suggested the alternative design of having the NICS activate the parking brake, noting that Defendant "already had designed a version of the NI[C]S that automatically set the parking brake." (Nemire Report at 6.)  Dr. Nemire also suggested a design where wheel chocks or other mechanical restraints are automatically placed when the truck is parked on an incline, citing to a study.  (*Id.* at 8.)  Thus, even absent testing, there are indicia that the alternative designs are reliable.  To the extent Defendant seeks to challenge such opinions, they may present expert testimony for a jury to decide.

e. Propensity

Finally, Defendant seeks to exclude Mr. Herbert's and Dr. Nemire's testimony regarding propensity.  (Def.'s Mot. to Strike at 20.)  Mr. Herbert opined that the NICS had "a high propensity for failure," pointing "to the complexity of the setup, the propensity for malfunctions due to failed components, and broken or otherwise compromised air lines and connections." (Herbert Report at 8.)  Defendant contends that in his deposition, "Mr. Herbert conceded that his only basis for this statement is the number of components involved in the [NICS].  He agreed that complexity does not necessarily translate to high failure rate." (Def.'s Mot. to Strike at 20.)  Defendant mischaracterizes Mr. Herbert's testimony as he did not concede the latter point.  Mr. Herbert explained that he was trying to articulate that "[t]he more components that are in there the more potential there is for failure." (Westfall Decl. ISO Mot. to Strike, Exh. 7 ("Herbert Dep.")) at

14

1   183:19-25.) With respect to failure, Mr. Herbert did not state that complexity would not
2   necessarily translate to a higher failure rate, but that complexity did not mean it would be difficult
3   to *use*. (*Id.* at 183:25-184:3.) The Court denies Defendant's request to strike Mr. Herbert's
4   opinion.

Dr. Nemire found there was likely to be confusion regarding whether the NICS applies the parking brake or service brake. (Nemire Report at 5-6.) In so finding, Dr. Nemire pointed to Mr. Herrera's own confusion, evidence that other drivers did not understand the basics of the NICS, Mr. Carpenter's (Defendant's person most knowledgeable witness) observations that drivers were only using the NICS to hold their trucks in position and not applying the parking brake, and other studies regarding automated system and feedback. (*Id.* at 5.) Thus, Dr. Nemire's opinions have a factual basis. To the extent Defendant argues there may be contradictory evidence, these are questions of fact for the jury to decide. (*See* Def.'s Mot. to Strike at 21.) Further, the Court finds that Defendant's case authority is distinguishable. For example, in *Graves v. Mazda Motor Corp.*, the district court excluded the expert's opinion on propensity of confusion because his opinion repeatedly relied on "human factors," yet his human factors analysis was not based on any analysis of objective data. 675 F. Spp. 2d 1082, 1102-03 (W.D. Okla. 2009). Here, in contrast, there are facts and studies that Dr. Nemire did analyze and from which he made his conclusions. Thus, the Court denies Defendant's request to strike Dr. Nemire's opinion.

### B. Motion for Summary Judgment

#### i. Causation

Defendant argues that summary judgment should be granted because there is no evidence of causation, specifically that "there is no evidence that the air pressure was low, the [NICS] was engaged, or the gear shifter was unintentionally moved when the truck began to roll." (Def.'s MSJx at 10.) The Court finds there is sufficient evidence to create disputes of material facts.

First, with respect to the NICS system, there is evidence for a trier of fact to find that the NICS was activated and engaged. Even excluding Mr. Herrera's inconsistent statements, Plaintiffs point to other evidence that the NICS was in use. For example, Mr. Carpenter testified that the NICS had to be used to collect garbage, as features required for the body requires the

NICS to turn on the hydraulics. (Carpenter Decl. at 65:18-66:24.) Dr. Granda also opined that if the truck was able to freely roll downhill, as it would in third gear, it would have caused tremendous damage to the house at 90 Parnassus Road. (Granda Report at 7.) Instead, the truck moved more slowly because there were braking forces acting all the way down, which Plaintiffs assert was due to the NICS applying the service brakes as the parking brakes were not in use. (*Id.*)

Second, with respect to the air pressure, there is no inconsistency in Mr. Herrera's statements that there was an unusual hissing sound before the truck began to roll. Dr. Granda also points to the pressure gauge, which indicated that the pressure on the air brake system was between 55 and 60 psi. (*See* Granda Report at 6, 47.) To the extent Defendant argues that there was no defect to the air pressure system (or any other system) based on the Berkeley, CHP, and BPD reports, this is a question of fact for the jury to decide. (*See* Def.'s MSJx at 12-13; Def.'s Reply at 7.) For example, Dr. Granda reviewed the CHP investigation and found that the air leaks found were significant, disagreeing with the CHP's conclusion of no significance. (Granda Report at 72-75.) Finally, while Defendant argues that Plaintiff's experts did not calculate at what psi the brakes would no longer hold, it is not clear how this is significant when there can be no dispute that the brakes did not completely hold, given that the Subject Vehicle would not have rolled if the brakes had held. (*See* Def.'s MSJx at 12-13.)

Finally, whether the gear shifter moved is also a question of fact for a jury to decide. While Defendant may point to the CHP and Berkeley investigations that found the transmission shifter was in the third gear when the truck began to roll, Plaintiffs can point to Dr. Granda's expert report explaining how the lever could have been moved from neutral to third gear after the Subject Vehicle rolled. (*See* Granda Report at 51-52.)

Ultimately, Defendant's arguments are largely disagreements with Plaintiff's theory of the case by pointing to other reports, including the Berkeley, CHP, and BPD reports, which disagree with the opinions of Plaintiff's experts. Such questions must be decided by a jury, and are not appropriately determined at summary judgment. The Court concludes that there is sufficient evidence of causation for this issue to be decided by a jury.

### ii. Failure to Warn

In the alternative, Defendant seeks summary judgment on Plaintiff's failure to warn claim because Plaintiff was a "sophisticated user." (Def.'s MSJx at 15.) In general, "manufacturers have a duty to warn consumers about the hazards inherent in their products. The requirement's purpose is to inform consumers about a product's hazards and faults of which they are unaware, so that they can refrain from using the product altogether or evade the danger by careful use." *Johnson v. Am. Standard, Inc.*, 43 Cal. 4th 56, 64 (2008). Manufacturers may be held "strictly liable for injuries caused by their failure to warn of dangers that were known to the scientific community at the time they manufactured and distributed their product." *Id.*

The "sophisticated user" defense, however, "exempts manufacturers from their typical obligation to provide product users with warnings about the products' potential hazards." *Johnson*, 43 Cal. 4th at 65. Thus, "[a] manufacturer is not liable to a sophisticated user of its product for failure to warn of a risk, harm, or danger, if the sophisticated user knew or should have known of that risk, harm, or danger." *Id.* at 71. Under this standard, "there will be some users who were actually unaware of the dangers." *Id.*

The Court finds that Defendant has established that Plaintiff was a "sophisticated user," such that there was no duty to warn. Plaintiff argues that Defendant should have placed a warning that the NICS should not be used as a parking brake, and that drivers should not leave the vehicle without applying the parking brake. (Pl.'s Opp'n to MSJx at 22.) As Defendant argues, however, Decedent was a sophisticated user who knew "how to properly park the vehicle before exiting the cab," including applying the parking brake before exiting the truck's cab. (Def.'s MSJx at 17.)

Here, Decedent was a long-time garbage truck driver, who would help train other drivers on the operation of the garbage trucks, including the Subject Vehicle. (Westfall Decl. ISO MSJx, Exh. 11 ("Zavaterro Dep.") at 25:13-23.) In that training, drivers were told they could use the NICS only on flat areas, but that on hills, they should also use the parking brake or wheel chocks. (Zavaterro Dep. at 30:14-31:16; Westfall Decl. ISO MSJx, Exh. 14 ("Marquina Dep.") at 27:18-22 ("Q: As a helper and driver, did you receive training from the City of Berkeley about whether or not you should use the parking brake and wheel chocks on hills and inclines? A: Yes."); Siegel

Decl., Exh. 5 ("Carr Dep.") at 20:10-14 ("Q: If you were on a steep hill, though, or incline, you'd use the parking brake. Is that what I hear? A: Yeah, I mean, in most cases you would use a parking brake."), Dkt. No. 63.) Significantly, Decedent in fact trained other drivers that on hills, they should "put it in neutral interlock, **hit that parking brake**." (Zavaterro Dep. at 31:24-32:6.) Thus, Decedent had actual knowledge that the NICS did not activate the parking brake, and that he had to set the parking brake separately, particularly on hills.

To the extent Plaintiff presents evidence that some individuals were unclear about how the NICS worked and the lack of training on the NICS specifically, this does not show that Decedent himself was confused or that he did not know he was supposed to be using the parking brake separate from the NICS. (*See* Pl.'s Opp'n to MSJx at 5.) Again, Decedent trained other drivers to use the parking brake on the hills, separate from the NICS. (*See* Zavaterro Dep. at 31:24-32:6.) Likewise, Plaintiffs' evidence that drivers did not use the parking brake when they were supposed to does not go to lack of knowledge. (Pl.'s Opp'n to MSJx at 6.) Evidence that other individuals, such as mechanics or Berkeley's Occupational Health and Safety Officer, do not go to whether *Decedent* was a sophisticated user. (*Id.* at 6-7.)

In the alternative, Plaintiff argues that the sophisticated user defense can be undermined where "the sophisticated user's misuse of the product was foreseeable," citing to *In re Related Asbestos Cases*, 543 F. Supp. 1142 (N.D. Cal. 1982). (Pl.'s Opp'n to MSJx at 24.) There, however, the misuse was focused solely on whether an employee can negate the sophisticated user defense where his *employer* was the sophisticated user, and the employer's misuse of the product was foreseeable; in other words, foreseeable misuse is considered when a plaintiff's employment relationship with a sophisticated intermediary would otherwise shield a manufacturer from liability. 543 F. Supp. at 1151; *see also Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1296 (2013); *Cunningham v. Buffalo Pumps*, B198465, 2008 Cal. App. Unpub. LEXIS 9430, at *44 (Nov. 24, 2008) ("where . . . the employer, and not the plaintiff, . . . was asserted to have the knowledge . . . the plaintiff may undercut the defense by showing the sophisticated user's misuse of the product was foreseeable"). Specifically, the defendants had argued that the Navy, as the employer, was aware of the dangers of asbestos, thereby absolving the defendants of liability for

18

failure to warn the Navy's employees of the products' dangers. *In re Related Asbestos Cases*, 543 F. Supp. at 1151. The district court found that the California Supreme Court would likely permit a sophisticated user defense provided "that the plaintiffs were permitted to negate the defense by showing that the sophisticated employer's misuse of the product was foreseeable, and so did not absolve the defendants of liability for failure of the duty to warn." *Id.* Plaintiff does not cite any case where the actual *user's* misuse was foreseeable, and the Court has not found any.[6] *But see Teston v. Valimet*, F055889, 2009 Cal. App. Unpub. LEXIS 6986, at *25 (Aug. 28, 2009) (finding the sophisticated user doctrine applicable where the plaintiff argued that his accident was caused by a foreseeable misuse of the defendant's product).

Accordingly, the Court finds summary judgment on Plaintiffs' failure to warn claim is appropriate.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Defendant's motion to strike, and strikes the following:

(1) Dr. Granda's September 10, 2019 rebuttal report, except for Section II; and

(2) Dr. Granda's opinion regarding alternative designs which rely on the anti-lock brake system, the electronic control unit, and the back-up sensor.

The Court GRANTS Defendant's motion for summary judgment as to the failure to warn claim, but DENIES Defendant's motion for summary judgment with respect to all other claims.

IT IS SO ORDERED.

Dated: November 22, 2019

_____
KANDIS A. WESTMORE
United States Magistrate Judge

---

[6] It is also not clear if the California Supreme Court would adopt the foreseeable misuse argument. In *Johnson*, the California Supreme Court specifically did not address the issue. 43 Cal. 4th at 69 n.5.